**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(CIVIL DIVISION)**

| | |
|---|---|
| GRUNLEY CONSTRUCTION COMPANY, INC.,<br>15020 Shady Grove Road, Suite 500<br>Rockville, MD 20850<br><br>    Plaintiff,<br><br>    v.<br><br>DARWIN NATIONAL ASSURANCE COMPANY,<br>30 S. 17th Street, Suite 810<br>Philadelphia, PA 19103<br><br><u>SERVE ON REGISTERED AGENT</u>:<br>Corporation Service Company<br>1090 Vermont Avenue, NW Suite 430<br>Washington, DC 20005<br><br>and<br><br>ALLIED WORLD SPECIALTY INSURANCE COMPANY,<br>1690 New Britain Avenue, Suite 101<br>Farmington, CT 06032<br><br><u>SERVE ON REGISTERED AGENT</u>:<br>Corporation Service Company<br>1090 Vermont Avenue, NW, Suite 430<br>Washington, DC 20005<br><br>    Defendants. | Case No. 1:16-cv-784 |

## **COMPLAINT**

Grunley Construction Company, Inc. ("Grunley"), by counsel, for its Complaint against Defendants Darwin National Assurance Company ("DNA") and Allied World Specialty Insurance Company ("AWS"), hereby states as follows:

## NATURE OF THE ACTION

1. This is an action for breach of a performance bond brought by Grunley against DNA and AWS arising out of underlying breaches of a subcontract committed by Baltimore Steel Erectors, LLC ("BSE"), the principal of DNA and AWS.

## PARTIES

2. Grunley is a construction company incorporated in Maryland with its principal office in Rockville, Maryland.

3. On information and belief, DNA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

4. On information and belief, AWS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

5. On information and belief, AWS acquired DNA and therefore is responsible for DNA's obligations.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, fees, and costs.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391, in that Grunley does business in this judicial district, and a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTUAL ALLEGATIONS

8.      In 2012, Grunley entered into a prime contract (the "Prime Contract") with Euro Capital Properties, LLC ("Owner") to conduct renovations on the Watergate Hotel, which is located at 2650 Virginia Avenue, N.W., Washington, D.C. 20037 (the "Project").

9.      On or about May 14, 2014, Grunley and BSE entered into a written subcontract (the "Subcontract"), whereby BSE agreed, among other things, to provide "Structural Steel and Metal Decking" work on the Project. The original price of the Subcontract was $1,345,220.00. A true and correct copy of the Subcontract is attached hereto as Exhibit A.

10.     On or about November 21, 2014, DNA, as surety, issued a Performance Bond, No. D00001033, on behalf of BSE, as principal, and in favor of Grunley, as obligee (the "Performance Bond"). A true and correct copy of the Performance Bond is attached hereto as Exhibit B. In the Performance Bond, DNA guaranteed the performance of its principal, BSE, under the Subcontract, and agreed that it will "indemnify and save harmless [Grunley] of and from any and all loss, damage, and expense, including costs and attorney's fees for up to two (2) years from final completion, which [Grunley] may sustain by reason of failure so to do . . . ." *Id.*

11.     The terms of the Subcontract are expressly incorporated into the Performance Bond by reference.

12.     Under the express terms of the Subcontract, BSE covenanted and agreed to diligently and continuously prosecute and complete the work required by the Subcontract. Specifically, Article 25 of the Subcontract provides, in pertinent part: "The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the Work in a diligent and

expeditious manner." (Exhibit A, Subcontract, Article 25.)  Additionally, Article 10 of the Subcontract provides as follows:

> Time is of the essence with respect to the Subcontractor's performance of the work and Subcontractor's compliance with the terms and conditions of the Subcontract. The Contractor has the right to direct the manner in which the Subcontractor performs its work.  Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary.  If overtime or additional shifts are required solely to accelerate project completion through no fault of the Subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor.  Payments due may be withheld to insure timely progress and completion of work.  The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages and legal fees) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

(Exhibit A, Subcontract, Article 10.)

13. Under the express terms of the Subcontract (which are incorporated by reference into the Performance Bond), BSE covenanted and agreed that Grunley would be entitled to take certain steps to ensure that defective work under the Subcontract would be corrected.  In this regard, Article 15 of the Subcontract provides, in relevant part:

> Rejection by Contractor of any or all parts of defective work for failure to conform with the Subcontract shall be final and binding.  Such rejected work shall promptly be corrected or replaced by Subcontractor at Subcontractor's expense.  If Subcontractor fails to commence and diligently continue correction or replacement of such rejected work within forty-eight (48) hours, after receipt of written notice from Contractor to correct or replace the rejected work, Contractor may at its option remove and replace the rejected work and Subcontractor shall promptly reimburse Contractor for the costs of such removal and replacement of defective work.

(Exhibit A, Subcontract, Article 15.)

14. Under the express terms of the Subcontract (which are incorporated by reference into the Performance Bond), BSE covenanted and agreed that Grunley would be entitled to take

4

certain steps to ensure the completion of the Subcontract work in the event of a default by BSE with respect to its obligations under the Subcontract and upon three (3) days notice of such default by Grunley. In this regard, Article 14 of the Subcontract provides in part:

> The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: failure to expeditiously prosecute and complete the whole or any part of the Work in accordance with the current Schedule of Progress and/or directions from the Contractor; failure to pay for labor and material, payroll taxes, contributions, or insurance premiums; interference with the performance of work by others for any reason; an act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities.  If the Subcontractor breaches the Subcontract, Contractor shall have the right, after three (3) days written notice to the Subcontractor, in addition to any other rights and remedies provided by this Agreement, the other Contract Documents or by law: (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances, and other items thereon, all of which the Subcontractor hereby transfers, assigns, and sets over to Contractor for such purpose, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefore.  In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Contractor may immediately take the actions set forth in this Article 14.
>
> In case of termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work is completed to the satisfaction of Contractor and the Owner.  If the unpaid balance of the amount to be paid under this Agreement exceeds the cost and expense incurred by Contractor in completing the Work, such excess shall be paid by Contractor to the Subcontractor; but if the cost and expense to complete the Work exceeds the unpaid balance, then the Subcontractor and its surety shall pay the difference to Contractor.  Such cost and expense shall include: i) the cost of performing and furnishing all labor, services, materials, equipment, and other items required to complete the Work to the satisfaction of Contractor and the Architect, ii) all losses, damages, costs, and expenses (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and iii) all liquidated damages and other disbursements sustained, incurred, or suffered by reason of or resulting from the Subcontractor's default.

> Contractor does not waive any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 29, Termination for Convenience.

(Exhibit A, Subcontract, Article 14.)

16. Throughout work on the Project, serious problems with BSE's performance under the Subcontract surfaced. For instance, it was necessary for Grunley to supplement BSE by hiring additional subcontractors and also by using Grunley's own labor and material to fulfill BSE's contract work.

16. By letter dated October 30, 2015, Grunley sent to BSE, with copy to DNA, a Notice to Cure, stating in pertinent part:

> Baltimore Steel is in Default of their Subcontract Agreement by failing to "proceed with the performance of the work at such time and in sequence as the Contract may direct and/or required by the Schedule of Progress" in accordance with Article 10, Time is of the Essence.
>
> Baltimore Steel was notified in writing on Monday September 14, 2015 of the necessity to complete the installation of Stair 1. If Baltimore Steel did not re-mobilize, Grunley Construction's Notification stated that Baltimore Steel would be supplemented for the completion of the stair. Since that time Baltimore Steel has not made any attempt to complete the installation of the stair.
>
> In addition[] to the lack of progress at Stair 1, Baltimore Steel has not progressed with any work on the B1 canopy. On Friday, August 28, 2015 Grunley notified Baltimore Steel to mobilize on site to field dimension and fabricate the canopy steel. As with the work on Stair 1, Baltimore Steel has not made any attempt to remobilize to complete their work under the Subcontract Agreement.
>
> Lastly, Baltimore Steel was notified in writing on August 26, 2015 that the wind bracing in the ballroom needed to be completed. Baltimore Steel has not provided a plan [to] complete this work shown on the contract documents and included in their Subcontract Agreement.
>
> In accordance with Article 14, Default, Baltimore Steel has 72 hours to Cure the above notices regarding the incomplete work at Stair 1, the ballroom wind bracing and the B1 level canopy. If Baltimore Steel does not mobilize on sit, Grunley will

6

exercise its rights under Article 14, Default, to perform this work at Baltimore Steel's cost. Grunley hereby reserves all rights and remedies available to it against Baltimore Steel under the subcontract or at law, including any right of set off against any funds that ma[y] be due Baltimore Steel for the subject project.

17.     By letter dated November 5, 2015, Grunley sent to BSE, with copy to DNA, a Notice of Default, stating in pertinent part:

> Baltimore Steel is in Default of their Subcontract Agreement by failing to resolve the Cure notice sent in writing on 30 October 2015 with regards to the contractually-owed work at Stair 1, the B1 canopy and the Ballroom Wind Bracing.
>
> In accordance with Baltimore Steel's Subcontract Agreement Article 14, Default, Grunley Construction will perform this work [on] Baltimore Steel's behalf. The costs to complete this work will be deducted from Baltimore Steel's contract and any costs in excess of the contract will be pursued with Baltimore Steels surety. At this time the full extent of the cost to complete the aforementioned work are unknown and will be resolved at a later date.
>
> Grunley hereby reserves all rights and remedies available to it against Baltimore Steel under the subcontract or at law, including any right of set off against any funds that ma[y] be due Baltimore Steel for the subject project.

18.     Despite the notices issued by Grunley to BSE, BSE did not cure its deficient and/or untimely performance. Likewise, despite these notices, upon which DNA and/or AWS were copied, DNA and AWS did not respond either to cure BSE's breaches of the Subcontract or to reimburse Grunley for its damages, *i.e.*, the difference between BSE's subcontract balance and the total cost expended by Grunley to complete or correct BSE's work, payments to BSE's subcontractors or suppliers, and other default related damages.

19.     To date, BSE has failed to honor its obligations under the Subcontract and DNA and AWS have failed to honor their obligations under the Performance Bond, including those obligations expressly imposed on DNA and AWS by the Subcontract, which the Performance Bond incorporates by reference.

20. As a result of DNA's and AWS's (and BSE's) default, Grunley has incurred and will continue to incur damages, including completion, administrative, overhead, and other costs, interest, and attorneys' fees.

21. Grunley has performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from its performance obligations because of BSE's breaches of its obligations to Grunley and/or DNA's and AWS's breaches of their obligations to Grunley.

22. This action is being brought within two years from the date of substantial completion of the Project, as required by the Performance Bond.

## COUNT I
### (Breach of Performance Bond)

23. The allegations in the foregoing Paragraphs are incorporated herein by reference as if fully stated herein.

24. DNA and AWS issued a Performance Bond whereby DNA and AWS agreed, among other things, to pay Grunley, as obligee, all amounts owed to Grunley by reason of BSE's default under the Subcontract, up to $1,345,220.00. DNA, AWS, and BSE are jointly and severally liable under the Performance Bond.

25. DNA and AWS were informed timely of BSE's default under the Subcontract and failed or refused to cure the default.

26. DNA and AWS have failed to perform their obligations under the Performance Bond.

27. DNA's and AWS's failure to perform their obligations under the Performance Bond constitutes a breach of contract.

28. DNA's and AWS's failure and refusal to perform their obligations under the Performance Bond constitutes a breach of its duty of good faith and fair dealing.

29. Grunley performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from performance because of BSE's breach of its obligations to Grunley and/or DNA's and AWS's breaches of their obligations to Grunley.

30. As a result of DNA's and AWS's breaches, Grunley has suffered, and will suffer, substantial damages, in excess of $808,000.00.

31. DNA, AWS, and BSE and jointly and severally liable to Grunley for the damages incurred.

32. Grunley is entitled to an award of interest, costs, and attorneys' fees against DNA and AWS.

**WHEREFORE**, Grunley demands judgment in its favor and against DNA and AWS in an amount in excess of $808,000.00, as well as all other damages, costs, and expenses, including attorneys' fees, incurred by Grunley as a result of Defendants' failure to perform and other breaches, and for such further and different relief as the Court deems just and proper.

Dated: April 27, 2016				Respectfully submitted,


						*/s/ Robert J. Symon*
						Robert J. Symon, Esq. (Bar No. 436245)
						Eric A. Frechtel, Esq. (Bar No. 476967)
						Amy E. Garber, Esq. (Bar No. 498404)
						BRADLEY ARANT BOULT CUMMINGS LLP
						1615 L Street, N.W., Suite 1350
						Washington, DC 20036
						Telephone:	(202) 393-7150
						Facsimile:	(202) 347-1684
						Email:		rsymon@babc.com
								efrechtel@babc.com
								agarber@babc.com

						*Counsel for Plaintiff*
						*Grunley Construction Company, Inc.*